**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DISTRICT**

| | | |
|---|---|---|
| DURK PEARSON, *et al.,* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. AW 8:04-cv-3600 |
| TOMMY G. THOMPSON, *et al.*, | * | |
| Defendants. | * | |

****

## MEMORANDUM OPINION

Durk Pearson ("Pearson") and Sandy Shaw ("Shaw") (collectively, "Plaintiffs") are formulators of dietary supplements containing S-adenosyl-L-methionine ("SAMe"). Plaintiffs seek a declaratory judgment to enjoin the Food and Drug Administration (the "FDA") and the Department of Health and Human Services (the "HHS") (collectively, "Defendants") from taking any action to preclude Plaintiffs from selling a report published by the United States government, which suggests SAMe as a possible treatment for various diseases. Currently before the Court are Plaintiff's Motion for Summary Judgment [14] and Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment [19]. The Court has reviewed the entire record, as well as the pleadings with respect to the instant motions. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will Grant Defendants' Motion to Dismiss and Deny Plaintiffs' Motion for Summary Judgment.

**I.     FACTUAL & PROCEDURAL BACKGROUND**

Plaintiffs design and distribute three different dietary supplements, each of which contain between 200 to 400 milligrams of enterically-coated SAMe. SAMe is an amino acid naturally created in human cells by the energy molecule ATP and the amino acid methionine. Found in every

living cell, SAMe plays an essential role in many important biochemical reactions in the human body. The use of SAMe as a dietary supplement and possible therapeutic agent for a number of diseases has recently received much attention in the popular press.

The directions for use posted on each of Plaintiffs' three dietary supplements indicate a recommended consumption of two to three capsules per day in conjunction with a betaine-containing dietary supplement. Plaintiffs receive royalties on the sale of the dietary supplements through various licensees, who market Plaintiffs' product.

In October, 2002, the Federal Agency for Healthcare Research and Quality (the "AHRQ"), a division of the HHS, published a report for the general public entitled, "S-Adenosyl-L-Methionine for Treatment of Depression, Osteoarthritis, and Liver Disease" (the "Government SAMe Report"). The Government SAMe Report summarizes the conclusions of published studies, which analyze the benefits of SAMe to treat depression, osteoarthritis, and liver disease. The Government SAMe Report concludes that while supplements containing SAMe are more effective than placebos in treating the symptoms of depression and osteoarthritis, SAMe does not appear to help treat liver disease. The Government SAMe Report is available on the worldwide web without restriction via links from at least seven individually accessible websites.

In 2004, Plaintiffs wrote a prologue to the Government SAMe Report, which explains the role of SAMe in different bodily activities and lauds the conclusions contained within the Government's SAMe Report. Plaintiffs intend to sell a bound volume ("Publication"), consisting of their prologue and the Government SAMe Report, to the general public, including to consumers of the SAMe-containing dietary supplements sold by Plaintiffs' licensees.

Plaintiffs have yet to distribute the Publication to their licensees out of fear of prosecution

by the FDA. Specifically, Plaintiffs claim that if they distribute the Publication, the FDA, pursuant to their administrative enforcement policy, would classify the SAMe-containing supplements as "new drugs" – as opposed to dietary supplements – thus prohibiting the sale of the Publication to consumers. At the time this action was filed, the FDA had not commenced or threatened procedures to either prohibit the sale of the Publication or to prosecute the Plaintiffs for FDA violations.

On November 10, 2004, Plaintiffs brought this action seeking to: (1) declare Defendants' ban on the sale of the Publication a violation of the First Amendment; (2) declare Defendants' ban on the sale of the Publication a violation of 21 U.S.C. § 343-2(b); (3) declare Defendants' action arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); (4) declare that Plaintiffs' licensees' sale of the Publication cannot be used as evidence of an intent to sell Plaintiffs' SAMe-containing dietary supplements as unapproved new drugs; (5) enjoin Defendants from taking any action to prohibit Plaintiffs' licensees from selling the Publication to the public; and (6) award attorneys' fees, costs, and any further relief the Court deems necessary.

On December 3, 2004, Plaintiffs filed their Motion for Summary Judgment, arguing that there exists no genuine issue of material fact and thus judgment in Plaintiffs' favor is warranted. On February 28, 2005, Defendants filed their Motion to Dismiss or, in the alternative, for Summary Judgment. Defendants argue that, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), Plaintiffs failed to state a claim for which relief can be granted. Additionally, Defendants argue that Plaintiffs' claims are not ripe for disposition.

## II. STANDARD[1]

It is well established that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In determining whether to dismiss a complaint pursuant to Rule 12(b)(6), this Court must view the well-pleaded material allegations in the light most favorable to the plaintiff and accept the factual allegations contained within the plaintiff's complaint as true.  *See Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997) (*citing Estate Constr. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 217-18 (4th Cir. 1994)); *Chisolm v. TranSouth Finan. Corp.*, 95 F.3d 331, 334 (4th Cir. 1996).

The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation."  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (*citing Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981)); *Young v. City of Mount Ranier*, 238 F.3d 576, 577 (4th Cir. 2001) (the mere "presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)").  Nor is the Court "bound to accept [a plaintiff's] conclusory allegations regarding the legal effect of the facts alleged."  *United Mine Workers of Am. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1994); *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).  Thus, a complaint may be dismissed as a matter of law if it lacks a cognizable legal theory *or* if it alleges insufficient facts to support a cognizable legal theory.  *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984) (*citing* 2A J. Moore, Moore's Federal Practice

---

[1]The Court will employ a 12(b)(6) motion to dismiss standard as the Court need not look beyond the pleadings in its analysis.

¶ 12.08 at 2271 (2d ed. 1982)).

**III.** **ANALYSIS**

    **A.** **Background**

Plaintiffs' claims fall under the purview of the Federal Food Drug and Cosmetic Act (the "FDCA"). The primary objective of the FDCA is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its "intended use." *FDA v. Brown & Williamson Tobacco Corp.*, 529 US 120, 133 (2000) (citing 21 U.S.C. § 393(b)(2)). The FDA applies an "intended use" inquiry to determine a product's statutory classification, such that "drugs" are defined as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease." 21 U.S.C. § 321(g)(1)(B)(2004). It has been consistently and uniformly held that the "intended use" of a product, within the meaning of the FDCA, "is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant sources." *Action on Smoking & Health v. Harris*, 655 F.2d 236, 239 (D.C. Cir. 1980); *see United States v. Undetermined Quantities of Articles*, 698 F. Supp. 692, 698 (D. Md. 2001) (finding street drug alternatives to be drugs under the FDCA).

In 1994, Congress amended the FDCA by enacting the Dietary Supplement Health and Education Act of 1994 (the "DSHEA"). Pursuant to the DSHEA, dietary supplements are defined as products "intended to supplement the diet that bears or contains [a] dietary ingredient." 21 U.S.C. § 321(ff)(1)(2004). Manufacturers are unequivocally prohibited from making claims that a dietary supplement diagnoses, mitigates, treats, cures, or prevents a specific disease or class of diseases. 21 U.S.C. § 343(r)(6)(2002). Manufacturers that make such claims without the permission of the FDA risk civil and criminal penalties. 21 U.S.C. § 333 (2003).

5

The consequences of the classification of a product as a "new drug,"[2] or a dietary supplement are substantial. 21 C.F.R. §§ 101.14; 101.70. If a product is classified as a new drug, the manufacturer must gain approval prior to introducing the drug into interstate commerce. 21 U.S.C. § 355 (2003). Approval is gained once the FDA determines the drug is safe and effective by means of controlled clinical studies. *Id.* On the other hand, dietary supplements that make health claims are only subject to identical pre-authorization requirements as conventional foods. 21 U.S.C. § 321(ff) (2004).

## B.    Ripeness

Defendants argue that Plaintiffs' claims must be dismissed because the claims are not ripe for judicial review. In support of this defense, Defendants argue that the determination of whether the sale of the Publication by Plaintiffs' licensees would cause the FDA to categorize Plaintiffs' products as "new drugs" is dependent upon Plaintiffs' purpose in selling the Publication. Accordingly, the Court in reviewing the agency's final determination would need to make a fact-specific inquiry regarding the "intended use" of the product. Defendants argue that, because this analysis would necessarily include several contingencies not yet before the Court – such as the manner in which the Publication is displayed – the Court should withhold judicial review. Furthermore, Defendants assert that Plaintiffs' claims are not ripe for disposition as the FDA neither threatened nor commenced any agency action against Plaintiffs or Plaintiffs' licensees. The Court agrees that the instant case is not ripe for review and will dismiss Plaintiffs' claims.

It is well-established that federal courts may issue declaratory judgment only where there

---

[2]A "new drug" is any "drug . . . [that is] not generally recognized, among experts . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1)(2004).

6

exists an actual controversy. *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992). As such, this Court will not prematurely adjudicate hypothetical claims based on contingent future events. *Texas v. United States*, 523 U.S. 296, 300 (1998); *Charter*, 976 F.2d at 209 (holding that no justiciable case or controversy existed where several variables separated the plaintiff from a threat of final agency action). Specifically, in the framework of an administrative case, before a court intercedes, there must be "an administrative decision [that] has been formalized and its effects felt by the challenging parties." *Pacific Gas & Elec. v. Energy Res. Comm'n*, 461 US 190, 200 (1983).

Due to the potential chilling effect of unconstitutional restrictions on free speech, ripeness analysis is often relaxed in First Amendment cases. *Forysth County v. Nationalist Movement*, 505 US 123, 129-30 (1992). To survive a ripeness challenge, a plaintiff must demonstrate "a live dispute involving the actual or threatened application of [a statute or policy] to bar a particular speech." *Renne v. Geary*, 501 US 312, 320 (1991). The Fourth Circuit has explained that, devoid a factual record of a concrete or threatened state action resulting in the suppression of speech, no ripe, justiciable controversy exists. *Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995); *see Jordahl v. Democratic Party of Virginia*, 122 F.3d 192, 198 (4th Cir. 1997).

In determining whether a claim is ripe for review, courts will consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Fitness involves a dual analysis of: (1) "the agency's interest in crystalizing its policy before that policy is subject to review;" and (2) "the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Id; Regional Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999). In other words,

a court must balance both the agency and court's interests against the hardship caused to the plaintiff by the Court withholding judicial review. *Id.* The Court will consider each of these factors in turn.

1.   **Fitness**

Although, the *Abbott* Court did not articulate a definitive list of factors for courts to consider when determining whether a claim is ripe for review, it did provide some general guidance for fitness determinations. 387 U.S. at 149. Interpreting *Abbott*, the Fourth Circuit has found that, in the context of an administrative case, claims are fit for adjudication when the issues considered are purely legal ones and where the agency rule giving rise to the claim is final and not subject to further contingencies. *Charter*, 976 F.2d at 208. If certain critical elements are contingent or unknown, the case is not ripe for judicial review. *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir. 1997). Stated differently, if certain facts are absent from the record that would significantly advance the court's ability to decide the legal question, a plaintiff's claims are not fit for review. *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 736-38 (1998) (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 82 (1998)).

Here, Plaintiffs seek to enjoin Defendants from taking any action to prevent Plaintiffs' Publication from being sold to consumers of their SAMe-based supplements. However, the Court cannot yet determine whether the sale of the Publication would change the product's "intended use," thus changing the classification of the dietary supplements to "new drugs" under the FDCA. The record is devoid of the facts needed to make this determination. For example, the record does not indicate who precisely will sell the Publication, the purpose for which the Publication will be used, when the Publication will be sold, and the manner in which the Publication will be distributed. All of the above inquiries are necessarily part of an analysis of the "intended use" of a product. *See*

8

*Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004) ("[C]laims about a product by its manufacturer and vendors, including product labeling, serve as evidence of the sellers' intent that consumers will purchase and use the product for a particular purpose – and, therefore, as evidence whether the product is or is not a drug.").

Determining whether a certain publication is evidence of "intended use" is an inquiry steeped squarely in the facts of the case. The following two cases, decided a year apart, are illustrative. In *United States v. Article of Drug Consisting of 250 Jars Etc. of U.S. Honey.*, 218 F. Supp. 208, 209-10 (E.D. Mich. 1963), *aff'd*, 344 F.2d 288 (6th Cir. 1965), a United States district court found jars of honey to be unapproved new drugs because booklets containing statements regarding the ability of honey to treat or cure various diseases were sold adjacent to the jars of honey. *Id.* In determining the booklets to be "labeling" and evidence of "intended use," the court considered such factors as the proximity of the booklets to the product, the promotion of the book by a salesman, and the aggressive methods used by the store to distribute the literature. *Id.* at 210-12.

*Article of Drug* stands in contrast to *United States v. 24 Bottles . . . Sterling Vinegar and Honey*, 338 F.2d 157 (2nd Cir. 1964). There, the Second Circuit found that booklets claiming that honey may be used as a treatment for various illnesses was *not* evidence that honey sold in the store – and specifically referenced by brand name in the book – was an unapproved new drug. *Id.* at 158-60. The *24 Bottles* court noted that the book in question was shelved with many other books and there existed no evidence of displays featuring both the product and the book. *Id.* Accordingly, the court determined that the sale of the book did not misleadingly label the medicinal value of the brand of honey. *Id.* at 159. Thus, employing inquiries based on the highly specific facts of the cases, two federal courts arrived at opposite conclusions in cases involving nearly identical products. Plainly,

9

cases considering the classification of drugs are grounded in fact-based inquiries.

Plaintiffs rely upon a New Jersey district court case, *Unites Stated v. Lane Labs*, 324 F.Supp.2d 547 (D.N.J. 2004), in arguing the existence of a case or controversy. Specifically, Plaintiffs argue that Defendants' policy of prosecuting individuals identified by the FDA as intending to sell an unapproved drug is evidence that the FDA *will* violate Plaintiffs' First Amendment rights, although they have not yet done so. However, *Lane Labs* does not provide for judicial redress prior to an administrative determination that a product constitutes a new drug under the FDAC.

The issue before the *Lane Labs* court was whether the United States was entitled to a permanent injunction prohibiting the defendants, Lane Labs, from marketing certain dietary supplements as treatments for cancer, skin cancer, and HIV/AIDS. 324 F.Supp.2d at 550. The court conducted an extensive analysis of the facts of the case in deciding that the United States was entitled to the injunction. *Id.* at 553-68. In concluding that the defendant's products were being marketed as unapproved new drugs, the court cited the defendant's marketing and distribution techniques including, but not limited to, the product's packaging, company mailings, kits distributed to doctors, emails, and various internet sites that all discussed the defendant's products as possible treatments for various diseases. *Id.* at 553-64. As such, the *Lane Labs* court found evidence of "intended use" only after examining a complete factual record, something that is lacking in the instant case. *Id.*

In this case, Defendants have not threatened or initiated any action against Plaintiffs; the Court will not construe Defendants' alternative arguments for dismissal as evidence of a final

agency determination.[3]  Despite the relaxed ripeness standard accorded to First Amendment claims, fitness principles may require the Court to defer judgment until a more concrete issue arises. *Woodall*, 47 F.3d at 658.  Here, there exists no final agency action.  While Plaintiffs may be reasonable in their prediction that the FDA may threaten action if and when the Publication is used to promote the SAMe-containing supplements, the Court will not exercise judicial review until the agency's determination is finalized.

In short, the claims that Plaintiffs bring forth in their Complaint rely upon fact-based inquiries and cannot be decided purely as issues of law.  Here, the issues Plaintiffs raise in their Complaint – a First Amendment violation, a violation of 21 U.S.C. § 343-2(b), and a violation of the Administrative Procedure Act – are all contingent upon the way in which the Publication is distributed in relation to the SAMe containing supplements.  This Court cannot and will not prematurely adjudicate an issue that is not yet fit for judicial review, and thus must at the present time decline to hear Plaintiffs' claims.

### 2. Hardship

The hardship prong of the ripeness inquiry is analyzed by considering both (1) the immediacy of the threat and (2) the burden imposed upon the party compelled to act under threat of enforcement of the challenged law.  *Charter*, 976 F.2d at 208.  For "deferral to be outweighed, postponing review must impose a hardship on the [plaintiff] that is immediate, direct, and

---

[3] As a general policy, the FDA will "afford individuals and firms an opportunity to voluntarily take appropriate and prompt corrective action prior to the initiation of enforcement." FDA Regulatory Procedures Manual, March 2004, Ch. 10, Sect. 10-1.  By notifying parties prior to taking administrative action, the FDA believes "the majority of persons will voluntarily comply with the law when given information as to what is required . . ." *Id.*  Here, the record does not indicate that the FDA notified Plaintiffs of a possible violation of the FDCA nor does the record reflect that the FDA planned to commence action absent such notification.

significant." *West Virginia Highlands Conservancy, Inc. v. Babbit*, 161 F.3d 797, 800 (4th Cir. 1998). In determining whether a plaintiff's charges are serious enough to warrant immediate review, a court will consider the totality of the circumstances. *Id.* at 801.

Here, Plaintiffs allege harms due to be the loss of the right to free speech, the loss of the economic right to sell the Publication through their licensees, and the loss of royalties from their sale of both the Publication and SAMe-containing dietary supplements. However, these speculative losses do not outweigh the Court's interest in deferring review.

The losses that Plaintiffs anticipate are not immediate. By refusing, at this time, to grant the injunctive relief that Plaintiffs seek, the Court does not restrict the flow of information to the public. Consumers will still have access to the Government SAMe Report, as it can be read online for free at seven independent websites. Furthermore, upon a FDA determination that Plaintiffs did indeed violate the FDCA, the FDA will almost certainly allow Plaintiffs an opportunity to correct their actions and comply with the regulation. *See supra* footnote 3.

Because the factual record of Plaintiffs' marketing campaign is not yet articulated, the Court cannot determine whether an immediate threat of unwarranted prosecution exists that requires the granting of an injunction. As such, any economic losses would not be the direct result of this Court's determination to decline judicial review; instead, any future losses would be the result of Plaintiffs' decision as to how to market the Publication and the FDA's determination of whether that marketing strategy violates FDA rules. Thus, by refusing to grant the injunctive relief Plaintiffs seek, the Court does not impose a direct or significant hardship on Plaintiffs, who recognize that they must comply with established FDA guidelines, which proscribe the promotion of dietary supplements as possible treatments for various diseases.

Insofar as Plaintiffs have not shown an immediate, direct, or significant hardship that outweighs the judicial interest in deferring judgment, all claims must be dismissed. This Court refuses to undermine the regulations set forth in the FDCA by shielding Plaintiffs from the FDA's statutory responsibilities without a complete and well developed factual record.

**IV      CONCLUSION**

For all of the aforementioned reasons, the Court finds the instant case not ripe for disposition. Accordingly, Plaintiffs' Motion for Summary Judgment [14] is DENIED. Defendants' Motion to Dismiss [19] is GRANTED. An Order Consistent with this Opinion will follow.

Date:   July 28, 2005                                         /s/
                                                              Alexander Williams Jr.
                                                              United States District Court